United States District Court
Southern District of Texas
**ENTERED**
February 09, 2017
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| RICHARD  SCHMIDT, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. H-16-3614 |
| | § | |
| MARK  NORDLICHT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## ORDER GRANTING MOTION FOR REMAND

The plaintiff, litigation trustee for the Black Elk Litigation Trust, originally filed this action in Texas state court.  The defendants removed the case, the plaintiff moved to remand, the defendants responded, and the plaintiff replied.  (Docket Entries No. 1, 17, 19, 36, 37, 39).  The court heard oral argument on the motion on February 3, 2017.  This order memorializes the court's record ruling that the motion for remand, (Docket Entry No. 17), should be granted under the mandatory abstention provisions of 28 U.S.C. § 1334(c).

This case arises from the 2015 bankruptcy of Black Elk, a Houston oil and gas company.  Schmidt, the plaintiff, is the litigation trustee for the Black Elk estate.  Part of the confirmed bankruptcy plan was the creation of a litigation trust to pursue Black Elk's potential claims.  On October 26, 2016, Schmidt filed (on behalf of the trust) an adversary proceeding against multiple companies associated with Platinum Partners, LP, a New York hedge fund.

That adversary proceeding alleges that Platinum acquired a controlling stake in Black Elk and eventually dominated its day-to-day business operations.  (Docket Entry No. 1-3, Ex. C (adversary complaint) at ¶¶ 2-4).  Between 2012 and 2014, the combination of generally poor market conditions and an oil platform blowout left Black Elk in a perilous financial situation.  (*Id.*).

1

Schmidt alleges that, faced with the prospect of serious investment losses, Platinum contrived to illegally funnel Black Elk funds into its own pocket through a series of improper financial transactions. Specifically, Platinum allegedly caused Black Elk to sell its main assets to Renaissance Offshore, LLC, and then contrived to have Black Elk use the proceeds of that sale, nearly $100 million, to redeem Platinum's series E equity instead of senior secured notes that would ordinarily have been the primary beneficiaries of the sale. (*Id.* ¶ 5). Schmidt alleges that Platinum engaged in a series of improper, misleading, and illegal steps to effectuate the equity redemption. This scheme allowed Platinum to simultaneously reap the benefits of the transaction and keep its place at the head of the line as a senior debt-holder in the impending bankruptcy (which was precipitated in part by the equity redemption). (*Id.* ¶ 6-8).

The complaint also alleges that Platinum engaged in other misconduct, including misappropriating Black Elk business opportunities. The adversary complaint states various claims; several are relevant for present purposes. The first is an avoidance action under § 548(a)(1)(A) of the Bankruptcy Code, based on the claim that the equity redemption was a fraudulent transfer designed to privilege Platinum over other creditors. (Id. ¶¶ 104-09). The second is an avoidance action under § 548(a)(1)(b), based on the claim that Black Elk did not receive reasonably equivalent value in exchange for the $100 million it sent to Platinum. (*Id.* ¶¶ 110-14). Third, the complaint alleges that Platinum violated the Texas Uniform Fraudulent Transfer Act. (*Id.* ¶¶ 115-122). Fourth, it argues that Platinum was Black Elk's alter ego and therefore responsible for Black Elk's debt. (*Id.* ¶¶ 128-34).

That adversary proceeding is still pending in Judge Isgur's court. The current action, filed in Texas state court on November 3, 2016 (a few days after the adversary proceeding), concerns

2

substantially the same set of facts.  However, no Platinum entity is a defendant in the present action.

Instead, the defendants are all individuals affiliated with Platinum or with Black Elk, either as

directors, officers, or management.  The current complaint's factual allegations are very similar to

those in the adversary proceeding, though they appear to add a good deal of color regarding which

individual defendants undertook what actions.  But the complaint carefully and clearly states only

Texas-law causes of action.  First, it states a claim for negligence and gross negligence against the

Black Elk manager and officer defendants, alleging that they owed duties of care and loyalty to the

company and breached those duties by approving or failing to prevent various transfers of Black Elk

assets to Platinum.  (Docket Entry No. 1-2, Ex. B (state-court complaint) at ¶¶ 111-16).  Second, it

states a claim for breach of fiduciary duty against the Black Elk managers and officers and the

Platinum-affiliated defendants, alleging that the transfers violated those duties.  (*Id.* ¶¶ 117-24).

Third, it alleges that the Platinum-affiliated defendants made fraudulent misrepresentations in the

course of their purported pillaging of Black Elk assets.  (*Id.* ¶¶ 125-29).

The remand motion is based on a lack of federal jurisdiction because the action is not

"related to" the Black Elk bankruptcy.  Alternatively, the motion argues that, even assuming

jurisdiction exists, the mandatory abstention principles in 28 U.S.C. § 1334(c) control.  Both are

examined below.

## I.     "Related to" Bankruptcy Jurisdiction

Subject-matter "[j]urisdiction for bankruptcy cases is defined by 28 U.S.C. § 1334."  *In re*

*TMT Procurement Corp.*, 764 F.3d 512, 523 (5th Cir. 2014) (per curiam).  Under the first subsection

of § 1334, district and therefore bankruptcy courts have exclusive jurisdiction over "all cases under

title 11." 28 U.S.C. § 1334(a).  That subsection refer to bankruptcy cases initiated by the filing of

a bankruptcy petition.  *See Matter of Wood*, 825 F.2d 90, 92 (5th Cir. 1987).  It is inapplicable here.

A district court and the bankruptcy courts in that district also have "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  *Id.* § 1334(b).  "Because § 1334(b) defines jurisdiction conjunctively, 'a district court has jurisdiction over the subject matter if it is at least related to the underlying bankruptcy.'"  *In re TMT*, 764 F.3d at 523 (quoting *Matter of Querner*, 7 F.3d 1199, 1201 (5th Cir. 1993)).

"The bankruptcy court's 'related-to' jurisdiction is not limitless."  *In re Morrison*, 555 F.3d 473, 479 (5th Cir. 2009) (citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995)).  "Related to" is a term of art in this context.  The term does not encompass all proceedings with any connection at all to the bankruptcy.  *In re Bass*, 171 F.3d 171 F.3d 1016, 1022 (5th Cir. 1999).  Common facts between the underlying bankruptcy and the claim for which a party seeks a federal forum are not enough.  *In re Canion*, 196 F.3d 579, 585 (5th Cir. 1999).  A matter is "related to" the bankruptcy if "the anticipated outcome of the action" could conceivably "(1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect on the administration of the estate."  *In re Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999).  The claims asserted here are plainly "related to" the bankruptcy under this standard; a bankruptcy litigation trust is asserting claims that, if meritorious, will result in more money going into the bankruptcy estate for distribution to creditors.

But, as Schmidt emphasizes, the Fifth Circuit has—to an ambiguous extent—circumscribed bankruptcy jurisdiction in cases where, as here, the bankruptcy court has confirmed the debtor's plan of reorganization.  The Fifth Circuit has held that, "[a]fter a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan."  *In re Craig's Stores of Texas,*

*Inc.*, 266 F.3d 388, 390 (5th Cir. 2001).  The court did not explain the universe of cases that would be permitted under an ordinary § 1334 analysis but excluded under the rule in *Craig's*.  Subsequent Fifth Circuit cases have referred to the *Craig's* standard for postconfirmation bankruptcy jurisdiction, but without providing additional clarity.  Indeed, the subsequent cases appear to undermine or at least narrow the *Craig's* opinion, noting that § 1334 does not put additional limits on bankruptcy jurisdiction (casting doubt on the decision's legitimacy) and emphasizing that *Craig's* facts and holding were "narrow."  *See  In re U.S. Brass Corp.*, 301 F.3d 296, 304 & n.25 (5th Cir. 2002); *In re Enron Corp. Sec.*, 535 F.3d 325, 335 (5th Cir. 2008).  The subsequent Fifth Circuit cases have not meaningfully clarified the circumstances in which the *Craig's* rule would kick a case otherwise meeting the § 1334 "related to" test out of federal court.  The circuit has acknowledged—without additional explanation—that it could "imagine cases where the two approaches would produce different results . . . ."  *In re U.S. Brass Corp.*, 301 F.3d at 305.

Additionally, it is not clear whether the *Craig's* rule applies when the debtor's confirmed plan is a plan of liquidation rather than a plan of reorganization.  *Craig's* turned on the idea that a reorganized debtor's confirmed plan marked the end of the bankruptcy and the emergence of a new reorganized business entity not dependent on the bankruptcy court's protection.  That rule makes a good deal of sense in the reorganization context, but in a liquidation case like this one there is no entity that emerges from the bankruptcy to continue operations.  Everything that the litigation and liquidation trusts established by the Black Elk plan do is intimately associated with the bankruptcy; their reason for existing is nothing more or less than maximizing the pot of money for distribution to creditors.  *Craig's*, *US Brass*, and *Enron* were all cases in which the confirmed Chapter 11 plan was a reorganization plan, not a liquidation plan.

Schmidt identifies what it characterizes as three factors that courts in the Fifth Circuit use in determining whether the *Craig's* rule applies. *In re: Upd Glob. Res., Inc.*, No. BR 11-36970-H5-11, 2016 WL 3964362, at *8 (S.D. Tex. July 21, 2016), *appeal dismissed* (Oct. 3, 2016). The court first notes that the Fifth Circuit did not set out these factors as a test for whether the *Craig's* rule applies; rather, they were set out as distinguishing factors to highlight how narrow the *Craig's* rule was. The three factors were not set out as a balancing test that invites equitable weighing. Rather, they were identified as a narrow basis justifying *Craig's* departure from the ordinary jurisdictional standard. *Enron*, 535 F.3d at 335; *see also US Brass*, 301 F.3d at 304 n.25.

With this in mind, the court examines the three factors. They are whether: (1) the claims arise from pre- or post-confirmation relations; (2) there was antagonism or a claim pending between the parties as of the date of the bankruptcy; and (3) any facts or law deriving from the bankruptcy are necessary to the claim.

The first factor unambiguously weighs in favor of federal jurisdiction; the challenged conduct predated the confirmation of the Black Elk bankruptcy plan. That makes *Craig's* inapplicable and vests jurisdiction in the federal court. The second issue also weighs strongly in favor of federal jurisdiction. Schmidt argues that no claim was pending before the bankruptcy. That is true, but antagonism existed in the relevant sense; the defendant's alleged wrongdoing harmed the company prior to the bankruptcy, and the company's cause of action appears to have accrued before the bankruptcy as well. The third factor does not weigh meaningfully in either direction.

The court has "related to" jurisdiction over the removed action and turns to analyzing mandatory abstention.

## II.     Mandatory abstention under 1334(c)

The bankruptcy jurisdiction statute, 28 U.S.C. § 1334, says that:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

*Id.* § 1334(c)(2).  If a party timely moves for the court to abstain from hearing state-law claims, the court must abstain if four additional factors are met: "(1) the claims have no independent basis for federal jurisdiction other than § 1334(b); (2) the claims are non-core; (3) an action has been commenced in state court; and (4) the action can be timely adjudicated in state court."  *In re Petroleum Prod. & Servs., Inc.*, 561 B.R. 662, 665 (Bankr. S.D. Tex. 2016) (quoting *In re Mugica*, 362 B.R. 782, 792 (Bankr. S.D. Tex. 2007)).

Most of the factors are uncontroversial here: the action is based on state law, was commenced in state court, the party opposing federal jurisdiction timely moved for abstention, and the only basis for federal jurisdiction is "related to" jurisdiction under § 1334(b).  The parties disagree on whether the claims are core or noncore, and whether the action can be timely adjudicated in state court.

The argument that the action cannot be timely adjudicated in state court is meritless.  There is no realistic reason to believe that the Texas court from which this action was removed would fail to address this litigation on a reasonably timely basis, which is all that is required.

This court's opinion in *WRT Creditors Liquidation Trust v. C.I.B.C. Oppenheimer Corp.*, 75 F. Supp. 2d 596 (S.D. Tex. 1999), provides useful guidance for determining whether the claims are core or noncore.  WRT Energy Corporation's liquidation trust sued Oppenheimer Corporation, Schroder & Co., and Jay Mark Miller, an individual, in Texas state court.  *Id.* at 599.  Miller was a

securities broker who worked at Oppenheimer; Miller and Oppenheimer provided financial services to WRT. *Id.* at 600. Schroder also provided financial services. *Id.* WRT filed for bankruptcy in the Western District of Louisiana. *Id.* WRT's liquidation trust filed an adversary proceeding in the bankruptcy court against its former officers and directors, alleging that they breached their fiduciary duties. *Id.* at 601. Some months later, the trust filed an additional eighteen adversary proceedings in the bankruptcy court, challenging a series of allegedly improper or fraudulent financial transactions that preceded WRT's bankruptcy. *Id.* Those adversary proceedings included "many of the same facts and same legal theories that are the basis of [WRT's] state law claims against Oppenheimer, Miller, and Schroder in" the Texas case. *Id.* This court continued:

> In the adversary actions, the WRT Trust alleged that a number of "outsiders" were involved in the fraudulent activities or in concealing the fraud. The outsider defendants are primarily the individuals, companies, and professionals who provided WRT different kinds of services and with whom WRT did business. Those outsider defendants included Oppenheimer and Miller. The WRT Trust alleged in the Louisiana actions that Miller was a "de facto WRT officer" and that Oppenheimer "acquiesced" in that status, allegations that are part of the state court suit removed to this court. In the adversary actions, the WRT Trust alleged that the outsider defendants conspired with the former WRT insider defendants in connection with the 1995 public offering, the same public offering challenged in the state court suit removed to this court.

> In the adversary proceeding against Oppenheimer and Miller, the WRT Trust alleged that Oppenheimer's investment banking fee for its role as a co-underwriter in the public offering, and Miller's share of that fee, should be set aside under the Bankruptcy Code as preferential transfers.

*Id.* The adversary proceedings also alleged state-law claims for fraud, inducement of breach of fiduciary duty, negligence, and breach of contract—but *not* against Oppenheimer or Miller. The claims against Oppenheimer and Miller were only federal bankruptcy-law claims. *Id.* at 601-02.

The same day that WRT filed the adversary proceeding against Oppenheimer and Miller in the bankruptcy court, it also sued in Texas state court. The Texas suit included state-law claims

nearly identical to those lodged against other individual defendants—but *not* against Oppenheimer or Miller—in the adversary proceedings. *Id.* at 602. The state-court petition did not include any federal causes of action. *Id.* The gist of the state court petition was that WRT had lost $130 million or more as a result of improper financial transactions that the defendants should have prevented. The petition sought to recover actual damages and to impose a constructive trust on the proceeds of the fraud and breach of fiduciary duty and all fees it had paid to the defendants. *Id.* at 602-03.

The defendants removed the case as one "related to" bankruptcy, and WRT moved to remand under § 1334(c). The main question the opinion addressed was whether the mandatory abstention provision applied. After reviewing the distinctions between core and noncore claims, this court had little trouble concluding that the state-law claims in that suit were noncore. Recognizing that the court is to look both to the form and the substance of the plaintiffs' allegations and legal theories, the court found that the state-law claims did not turn on federal bankruptcy law. Instead, these state-law claims, based on prepetition activity, asserted rights that existed independent of the bankruptcy; had there been no bankruptcy proceeding at all it still would have been possible to sue the defendants for their purported breaches of state-law duties. *Id.* at 609-12. Mandatory abstention applied and WRT's motion for remand was granted.

The facts here are similar to those in *WRT* and the reasoning and result apply here as well. Like the claims in *WRT*, all of the state-law theories that the Black Elk trust has brought would be equally viable as a standalone matter if no bankruptcy proceeding had been filed. And *WRT* rebuts the defendants' argument that the common nucleus of underlying facts, including a nearly-identical basis for damages, makes this case the functional equivalent of an action to undo a fraudulent transfer.

The defendants rely on a District of Connecticut case that comes out the opposite direction on less closely similar facts.  There, a creditor sued two accountants, claiming that they helped hide and transfer the assets of a bankrupt debtor; the complaint alleged misrepresentation, breach of fiduciary duty, conspiracy, and fraudulent misrepresentation.  *Master-Halco Inc. v. Scillia Dowling & Natarelli LLC*, No. 3:06-CV-01082-AHN, 2006 WL 6915644, at *1 (D. Conn. Nov. 17, 2006).  The court stated without substantial analysis that, even though all of the claims the plaintiffs brought were based on state law, the claim was nonetheless a core bankruptcy proceeding because the plaintiffs sought "to recover assets and funds that the Debtors concealed with the help of the Defendants" and therefore the action was the substantial equivalent of an action under the bankruptcy code for the recovery of a fraudulent conveyance.  *Id.* at *2.  *Master-Halco* appears to treat any action in which the underlying damages relate to money improperly taken from a debtor's estate as equivalent to an action under the Bankruptcy Code to recover for a fraudulent transfer.  But, as set out at length in *WRT*, that is not the correct approach.  As in *WRT*, it does not matter if some substantial portion of the factual proofs will overlap; what matters is that these same claims could have been filed and litigated regardless of whether Black Elk had gone bankrupt.  *Master-Halco* appears to conflate state-law claims that seek to recover damages for money improperly paid out of the debtor's possession with a claim for recovery of a fraudulent conveyance.  A bankruptcy-law claim for fraudulent conveyance has different elements and different proofs than a claim for, in this instance, Texas state-law fraudulent misrepresentation, breach of fiduciary duty, and the like.  The fact that the damages arose from an improper financial transaction does not mean that any action to recover those damages morphs into an action to undo a fraudulent conveyance under title 11.

### III.    Conclusion

For the reasons set out in this written opinion and stated in detail on the record at the February 3, 2017 hearing, Schmidt's motion to remand, (Docket Entry No. 17), is granted.  This case is remanded to the 129th District Court of Harris County, Texas.

SIGNED on February 9, 2017, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge